NOT DESIGNATED FOR PUBLICATION

No. 126,891

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HOWARD RAY PRUITT,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee.*


MEMORANDUM OPINION

Appeal from Butler District Court; CHARLES M. HART, judge. Oral argument held January 7, 2025. Opinion filed March 28, 2025. Affirmed.

*Christopher M. Joseph* and *Carrie E. Parker*, of Joseph, Hollander & Craft LLC, of Topeka, for appellant.

*Cheryl M. Pierce*, assistant county attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before GARDNER, P.J., MALONE and COBLE, JJ.

PER CURIAM: After a jury convicted Howard Ray Pruitt of the first-degree murder of Phillip Little, the district court sentenced Pruitt to life imprisonment without the possibility of parole before he served 25 years. Pruitt then unsuccessfully appealed his conviction. See *State v. Pruitt*, 310 Kan. 952, 453 P.3d 313 (2019). Pruitt then filed a K.S.A. 60-1507 motion, arguing that his trial counsel was ineffective. Pruit now appeals the Butler County District Court's denial of that motion. But because Pruitt fails to meet his burden to show ineffective assistance of counsel, we affirm.

1

*Factual and Procedural Background*

Before the fatal shooting of Little, he had an ongoing dispute with Pruitt. Nathan Coe, an acquaintance of Pruitt, was aware of that disagreement. Coe testified he knew Pruitt was interested in harming Little, either through his own acts or by paying someone else to do it. Knowing Pruitt's desire to harm Little, Coe called Pruitt on the night of the murder to tell Pruitt that Little was at Skylar Morgan's trailer home. Several witnesses testified that Pruitt went there with a gun, shot Little, discarded the gun, and then asked Perry to move the gun to a different location. Because the facts are reported at length in the Kansas Supreme Court's opinion on Pruitt's direct appeal, we do not repeat them here. Coe was originally charged with Little's murder, but Pruitt was later charged with the first-degree murder of Little. The jury found Little guilty of premeditated first-degree murder and the district court sentenced him to a hard-25 life sentence.

*Pruitt's Direct Appeal*

In Pruitt's direct appeal, Pruitt asserted that the prosecutor erred during closing argument, the district judge erroneously instructed the jury, a juror slept during part of the proceedings, and that cumulative errors precluded a fair trial. 310 Kan. at 953.

The Kansas Supreme Court rejected all of Pruitt's arguments on error but two and concluded that "those two errors do not individually or collectively command reversal of Pruitt's conviction." 310 Kan. at 974-75. It found: "In light of the strength of the evidence produced by the State, the errors did not cumulatively prejudice Pruitt, and they did not deprive him of a fair trial." 310 Kan. at 974. The Supreme Court elsewhere found: "This is a case in which the defendant's guilt of first-degree premeditated murder was supported by truly overwhelming evidence." 310 Kan. at 953. It thus affirmed Pruitt's first-degree murder conviction. 310 Kan. at 975.

*Pruitt's K.S.A. 60-1507 Motion and Evidentiary Hearing*

Pruitt then timely filed a K.S.A. 60-1507 motion asserting multiple grounds of error. After filing his 60-1507 motion, Pruitt retained counsel who filed an amended 1507 motion which significantly narrowed Pruitt's initial arguments. It asserts:

> "As a result of ineffective assistance, Mr. Pruitt was denied a fair trial. He received ineffective assistance of counsel when his trial attorney failed to request a mistrial or cautionary instruction because the jury heard and saw inadmissible evidence about Mr. Pruitt's location on the night of the murder (including Exhibit 40, that was admitted and then struck) and inadmissible testimony that Billy Heise told police he sold the murder weapon to Mr. Pruitt. Trial counsel was also ineffective for failing to make reasonable investigations of important facts in the case before the trial and in connection with post-trial motions."

The memorandum in support of the motion argued only two grounds for relief. Both asserted ineffective assistance of trial counsel: (1) by not moving for a mistrial after the jury heard and considered Pruitt's phone location evidence (State's Exhibit 40) that the district court had excluded as "'more prejudicial than probative'"; and (2) by not presenting evidence about law enforcement's contamination of witness statements by "feeding nonpublic information to key witnesses."

*The 60-1507 hearing*

The district court held an evidentiary hearing on Pruitt's motion. The only witness was Pruitt's trial counsel, Gail Jensen. He testified that he had been practicing law for 47 years, with 40 of those years heavily focused on criminal defense, and had tried between 12 and 20 homicide cases.

3

Pruitt's 60-1507 counsel focused his questions on three areas: (1) Why Jensen had not moved to strike testimony about Billy Hise's sale of a shotgun to Pruitt; (2) how he had handled coercive police interviews of Ralph Ballinger and Perry; and (3) why he had not moved for a mistrial based on the fact that the jury had heard testimony about excluded Exhibit 40.

As for the sale of the gun, Detective Jeffrey Murphy testified at trial that Coe told him Hise sold Pruitt the gun. Hise did not testify at trial because he had failed to comply with his subpoena ordering him to be there. Jensen did not contemporaneously object to Murphy's testimony about what Coe told him regarding the sale of the gun. When asked at the 60-1507 evidentiary hearing why he did not request the testimony regarding the sale of the gun be stricken, Jensen stated that it was "likely an oversight."

Jensen was then asked about police interviews of Ballinger and Perry. Ballinger testified about the recovered gun and linked it to Pruitt. In one of Ballinger's interviews with police two weeks before trial, Jensen agreed that police showed Ballinger pictures of the gun that was alleged to have been used to murder Little before they asked him to describe the gun that he saw Pruitt take from his truck near the trailer. Jensen was also asked about Perry's interview near the start of trial when detectives showed Perry pictures of the gun they had recovered *before* Perry admitted to retrieving the gun and throwing it into the river and then described the gun as the one in the pictures. And before Perry admitted he disposed of the gun at Pruitt's direction, police told Perry that the Little family was "out to get him" and his daughter because he was protecting Pruitt by not sharing everything that he knew with law enforcement. During that interview, law enforcement also told Perry that he had "'a lot riding on'" telling the whole story and they "'cannot help [him] after a certain time.'" They also told him: "'Don't get caught up in something that you can help yourself. You got a little girl, and she needs her daddy. You don't need to be in prison. You don't need to be killed. You need to be her daddy.'" And

4

"'This is gonna ruin your life—uh, I think you do—by not being honest about it. And the stuff we're talking about, this will ruin your life.'"

Jensen believed these tactics were coercive, so he had filed a pretrial motion in limine to exclude Ballinger's and Perry's statements as coerced and thus involuntary. But that motion was apparently denied.

Pruitt's counsel then questioned Jensen about State's Exhibit 40. The document included a map and a table that showed the presence of Pruitt's cell phone near different cell towers. When the State moved to admit Exhibit 40 at trial, Jensen objected based on lack of foundation and hearsay, but the district court overruled those objections. Thus, it admitted Exhibit 40 and testimony was elicited about it. Detective Scott Roberts then testified that he had interviewed Perry, who reported a gun was in an area on that exhibit. He also testified that officers used the information in Exhibit 40 to search for the gun used in Little's murder. And because the Exhibit showed the location of Pruitt's phone on the night of the murder, it inferentially showed Pruitt's location as well.

Later during trial, an analyst from Mid-State Organized Crime Information Center testified about Exhibit 40, which he had prepared. The exhibit had a table in it that rated the cell service carrier's "confidence" level of each of the pinged locations of the cell phone. After cross-examining the analyst about Exhibit 40, Jensen moved to strike that exhibit and the testimony about it as immaterial and lacking probative value.

The district court judge sustained that objection in part, ruling:

> "The Court does sustain the objection of the defense. The Court finds that the— Exhibit No. 40 does not reach a reasonable degree of technological certainty. There's been no definition established as to degree of confidence as set forth on Exhibit No. 40.

The Court finds that Exhibit 40 may very well be more prejudicial than probative in value.

"And, once again, the Court does sustain the objection to strike Exhibit 40."

Although Jensen had moved to strike testimony related to Exhibit 40, the district court's ruling sustained only the objection to strike the Exhibit itself. Thus Detective Robert's testimony and the analyst's testimony about Exhibit 40 was not stricken.

When asked at the 60-1507 evidentiary hearing about the district court's ruling to strike only the exhibit, Jensen testified that he recalled making the motion to strike and getting a favorable ruling. But he did not recall six years after the trial why he had not asked for a limiting instruction that would have admonished the jury not to consider this. He did not recall thinking: "'Well, this would be a great strategy'; or 'That would be a great strategy.'" When asked why he did not ask for a mistrial, he replied that he thought: "'Great, we got a favorable ruling; on to the next thing,'" and that he was not sure he had ever had a motion for mistrial granted, other than when there was a hung jury.

At the end of the hearing, the court asked both parties to prepare proposed findings of fact and conclusions of law and later denied the K.S.A. 60-1507 motion.

*The District Court's Denial of the 1507 Motion*

The district court's order denying Pruitt's 60-1507 motion adopted the State's proposed findings of facts and conclusions of law. The order addressed three claims of ineffective assistance of counsel: (1) Jensen's failure to move for a mistrial after Exhibit 40 was stricken from the record; (2) Jensen's failure to move to strike the testimony that Pruitt had purchased from Hise a gun identical to the one used in the murder; and (3) Jensen's failure to "illicit [*sic*] testimony that law enforcement had previously told [Perry] the gun had been found and where it was later found by law enforcement."

6

As for Exhibit 40, the district court held that it was not ineffective for Jensen not to request a mistrial after the exhibit was stricken from the record because there was no fundamental failure in the proceedings that was so prejudicial it was impossible to proceed without injustice. The district court elaborated "[t]o make the finding of a fundamental failure the court would have to ignore . . . all the evidence . . . presented at trial of Mr. Pruitt's [guilt], and that evidence, in spite of Exhibit 40 and the testimony, was overwhelming." The court then summarized the evidence of Pruitt's guilt.

> "There was evidence that Mr. Pruitt had a gun with him on the night of the murder of Mr. Little. Evidence that Mr. Pruitt took the gun with him when he hid and waited for Mr. Little. Evidence that after shooting Mr. Little, Mr. Pruitt called Jacob and told him he had shot Mr. Little. Evidence that Mr. Pruitt told Jacob where he had hidden the gun, and told Jacob to retrieve it. Evidence that Jacob went to the location where the gun was hidden, retrieved the gun, took it and threw it into the Walnut River. Evidence that the gun was retrieved by law enforcement from the Walnut River. Evidence that a forensic examination was performed on the pellets recovered from Mr. Little's body, and shotshells recovered from Mr. Pruitt's vehicle, and pellets from the shot-shells recovered from the gun which were consistent with one another. [Citations omitted.]"

As for Jensen's failure to strike the hearsay testimony that Pruitt had purchased from Hise a gun identical to the one used in Little's murder, the district court explained that the record revealed that Murphy's testimony regarding the sale of the gun was objected to, and that objection was sustained.

Finally, regarding Jensen's failure to "illicit [*sic*] testimony that law enforcement had previously told [Perry] the gun had been found and where it was later found by law enforcement," the court found that Jensen aggressively cross-examined Perry, Ballinger, and Coe about their biases, their inconsistent statements, and their shifting stories during their interviews with law enforcement. The district court held that "[t]he effective

7

assistance of counsel cannot be equated with the successfulness of counsel," and that Jensen was not ineffective in any respect.

The district court also found no prejudice. It found that based on the other evidence against Pruitt, Pruitt failed to show a probability sufficient to undermine the confidence in the outcome of trial:

> "Even if the contested evidence had not been presented at trial, there still would have been testimony of Mr. Pruitt's telling [Perry] he shot Mr. Little, and that he had hidden the gun. There still would have been testimony that Mr. Pruitt told [Perry] to retrieve the gun and that [Perry] did so. There still would have been evidence that the gun was retrieved from where [Perry] threw [it] into the Walnut River. There still would have been evidence that [Ballinger] was with Mr. Pruitt when he drove to Mr. Little's and wait[ed] for Mr. Little and shot him."

For those reasons, the district court denied Pruitt's 60-1507 motion. Pruitt timely appeals, arguing solely that the district court erred by denying his 60-1507 motion because his trial counsel was ineffective.

*Standard of Review*

A district court has three options when handling a K.S.A. 60-1507 motion. See *State v. Adams*, 311 Kan. 569, 577-78, 465 P.3d 176 (2020). The district court held a full evidentiary hearing on Pruitt's motion, so the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2025 Kan. S. Ct. R. at 238). The district court did so here by adopting the State's proposed findings and conclusions. An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's

8

ultimate conclusions of law is de novo. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021); *Balbirnie v. State*, 311 Kan. 893, 897-98, 468 P.3d 334 (2020).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). An appellate court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *State v. Bentley*, 317 Kan. 222, 228, 526 P.3d 1060 (2023). Moreover, the Kansas Supreme Court "has repeatedly held appellate courts do not make factual findings, even if the record is sufficient for the court to reach the factual issues. Fact-finding is simply not the role of appellate courts." *State v. Nelson*, 291 Kan. 475, 488, 243 P.3d 343 (2010); see *State v. Gutierrez-Fuentes*, 315 Kan. 341, 346-47, 508 P.3d 378 (2022) (citing *Nelson* with approval).

*Was Pruitt's trial counsel ineffective?*

On appeal, Pruitt asserts four claims of ineffective assistance of counsel. First, he argues that his conviction substantially relied on witness testimony and defense counsel's "nonstrategic conduct" that impacted witness credibility. Second, he argues that his trial counsel was ineffective for failing to request a mistrial or a limiting instruction about the admission of State's Exhibit 40 and the failure to strike its corresponding testimony from the record. Third, he argues that his trial counsel was ineffective for failing to present evidence that suggestive interrogation tactics contaminated key witnesses' statements because such evidence would have undermined the reliability of the multiple accusers' testimony. Fourth, he argued that trial counsel was ineffective for inadvertently waiving his constitutional right to confrontation when counsel did not object to evidence confirming that Pruitt owned the type of gun used to murder Little. Within each of these issues, he argues that the deficient performance prejudiced him. Because Pruitt's first and third arguments speak to the same error, we address them together.

We analyze claims of ineffective assistance of trial counsel under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by the Kansas Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). The defendant has the burden to show that defense counsel's performance was deficient and to show a reasonable probability that absent defense counsel's unprofessional errors, the result would have been different. *State v. Evans*, 315 Kan. 211, 217-18, 506 P.3d 260 (2022).

To establish deficient performance under the first prong, the defendant must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance. That is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy. *Khalil-Alsalaami*, 313 Kan. at 486.

Under the second prong, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. 313 Kan. at 486. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218.

A. *Was Pruitt's trial counsel ineffective for failing to present evidence of suggestive interrogation tactics that would have undermined the reliability and credibility of key witnesses' testimony?*

We first consider whether Pruitt's trial counsel was ineffective for failing to present evidence that suggestive interrogation tactics contaminated key witnesses' statements, and that such evidence would have undermined the reliability of their testimony. Pruitt argues that trial counsel should have attacked Perry's and Ballinger's credibility by: (1) asking them whether officers had proposed scenarios to them during their interviews which they later repeated to officers as fact; and (2) asking whether officers had fed them nonpublic information about the investigation before they claimed to know about it. Pruitt contends that the jury did not hear about the sequence of the interrogation—for example, that their testimony changed after officers told them they would not get in trouble for saying something that they later parroted, and that they identified the gun only after seeing photos of it. Pruitt suggests that if the jury had heard about the sequence of the interrogation, it would have found Perry's and Ballinger's testimony lacked credibility due to the officers' interrogation tactics.

But as the district court found, Jensen aggressively cross-examined Perry, Ballinger, and Coe about biases and inconsistent statements they had made:

> "Mr. Pruitt argues that trial counsel was ineffective because trial counsel did not illicit [*sic*] testimony that law enforcement had previously told Jacob Perry the gun had been found and where it was later found by law enforcement. Jacob Perry testified that he took the gun to the river and dropped it off.
> "However, the trial record clearly indicates that trial counsel aggressively cross-examined Jacob Perry as well as Ralph Ballinger and Nathan Coe about biases and inconsistent statements made by each witness. The trial record clearly indicates that evidence was presented to the jury about the number of law enforcement interviews each witness was part of, and the changes with each witnesses['] statements. The trial record

11

clearly indicates that trial counsel vigorously, and aggressively cross-examined each of the witnesses including Jacob Perry.

> "The effective assistance of counsel cannot be equated with the successfulness of counsel. The adequacy of an attorney's services on behalf of an accused must be gauged by the totality of representation, not by fragmentary segments analyzed in isolated cells. *Chamberlain v. State*, 236 Kan. 650, 653, 694 P.2d 468 (1985). [Citations omitted.]"

The order concluded that Jensen's cross-examination of the witnesses was not deficient.

The district court also detailed the evidence against Pruitt that Pruitt had "ignore[d]" in making this argument:

> "Ralph Ballinger testified he drove to the crime scene location with the Plaintiff. Ralph attempted to dissuade the Plaintiff from taking the gun out of the vehicle and threatening Little. Ralph saw the Plaintiff remove the gun from the vehicle console area of the vehicle. Ralph described the gun as [a] sawed-off [.]410 open break over gun with a small shell attached by a rubber band. Law enforcement did not know anything about Ralph, it was on[ly] through his girlfriend Cassandra Maynard that his involvement with Mr. Pruitt came to light. Cassandra testified as to the statements Ralph made regarding being with Mr. Pruitt on the night of the murder, and Ralph's attempt to dissuade Mr. Pruitt from using his gun.
>
> Jacob Perry testified that the Plaintiff called him and told him he had shot Little, and that Jacob needed to pick up a gun. The Plaintiff gave Jacob the location of the gun, Jacob drove to the location and picked the gun up, drove it to the Haverhill Bridge at the Walnut River where he threw the gun in the water. The gun was recovered and it matched the description of the gun given by witnesses.
>
> A forensic examination of the gun, .410 shotshells recovered by law enforcement from the Plaintiff's vehicle, and the pellets recovered from the body of Little had consistent points. They were consistent in physical design[] and construction with a triple a-aught buck size pellet, and they were a copper-plated pellet, which not all buckshot pellets are copper-plated, and they were consistent in weight as well. [Citations omitted.]"

The district court thus tacitly found no prejudice.

Our review of the record shows substantial competent evidence supporting these factual findings, and these findings support the district court's legal conclusion that Jensen's cross-examination of crucial witnesses was not deficient. Jensen vigorously questioned both Perry and Ballinger about their biases and changing stories. In Perry's cross-examination, Jensen directly addressed law enforcement's investigation techniques.

And Jensen had challenged the officers' interrogation tactics when interrogating Ballinger and Perry as coercive in a pretrial motion to exclude their testimony, but the district court had denied that motion. Jensen was bound by that ruling at trial. Still, he adequately cross-examined these witnesses about law enforcement techniques and how their stories had changed over time. The jury, especially regarding Perry, heard that witness statements shifted the longer they spoke with law enforcement officers and faced pressure from them. Yet the jury still credited Ballinger's and Perry's testimony, as shown by its guilty verdict. We find adequate performance of counsel.

But even if Jensen's performance were inadequate, Pruitt has not met his burden to show prejudice. The district court's summary of the evidence against Pruitt finds that the (1) non-coerced testimony and (2) the evidence unrelated to the sequence of any interrogation tactics were sufficient to meet the State's burden of proof. And the Kansas Supreme Court's detailed recounting of what it found to be "strong evidence" that Pruitt had murdered Little, included not only testimony of Ballinger and Perry, but also Coe, Bobbie Myers, Matthew Kreusel, Morgan, Maynard, and this hard evidence:

> "Other testimony in the State's case established that a search of Pruitt's vehicle turned up 'a Federal Firearms .410 shotgun shell with a copper-colored projectile at the top of it.' In addition, a forensic pathologist testified about the two projectiles recovered from Little's body. The pathologist identified the cause of Little's death as the projectile that had gone through his aorta and trachea.
> "A Kansas Bureau of Investigation analyst involved in testing the recovered gun told Pruitt's jury about it and other items given to the KBI by the police. Those items

13

included 'an unknown polymer item,' two live Federal .410 shotshells, and two fired shot pellets. After clean-up, the analyst said, the recovered shotgun was functional. One of the two live shotshells had been connected to the barrel of the gun; the other was found in Pruitt's vehicle. Both shells were 'consistent with Federal Personal Defense . . . .410 bore shotshells, and they [were] loaded with four pellets of . . . triple-aught buck.' The two fired pellets recovered during Little's autopsy were copper in color and made of copper-plated lead. The 'weight and all of the physical characteristics of the[ ] two pellets [were] consistent with being triple-aught buck.'" 310 Kan. at 958-59.

Based on the totality of the evidence, Pruitt fails to show a reasonable probability that any deficient performance by counsel affected the outcome of the proceedings.

And as to every claim of ineffective assistance of counsel, the trial court expressly found no prejudice:

"Even if the contested evidence had not been presented at trial, there still would have been testimony of Mr. Pruitt's telling [Perry] he shot Mr. Little, and that he had hidden the gun. There still would have been testimony that Mr. Pruitt told [Perry] to retrieve the gun and that [Perry] did so. There still would have been evidence that the gun was retrieved from where [Perry] threw [it] into the Walnut River. There still would have been evidence that [Ballinger] was with Mr. Pruitt when he drove to Mr. Little's and wait[ed] for Mr. Little and shot him."

The district court correctly denied Pruitt's K.S.A. 60-1507 motion on this ground as well. Substantial competent evidence supports the district court's factual findings as to prejudice. Reviewing its conclusions of law de novo, we agree that Pruitt failed to show deficient performance or prejudice as to this issue.

B. *Was Pruitt's trial counsel ineffective for failing to request a mistrial?*

We next address Pruitt's argument that his trial counsel was ineffective for failing to request a mistrial as to testimony about State's Exhibit 40. Exhibit 40 included a map and a table, showing the approximate location of Pruitt's cell phone near different cell towers on the night of the murder. Officers used the map to try to locate the gun used to shoot Little. When Exhibit 40 was introduced, Jensen objected based on lack of foundation and hearsay. But the court overruled those objections and admitted Exhibit 40 into evidence, and testimony was elicited about it.

Later during trial, an analyst from Mid-State Organized Crime Information Center testified and discussed Exhibit 40, which he had prepared. The exhibit had a table on it that rated the cell service carrier's "confidence" level for each pinged location of Pruitt's cell phone. After cross examining the analyst on the information in Exhibit 40, Jensen moved to strike Exhibit 40 "and the testimony." The court found that Exhibit 40 lacked a reasonable degree of technological certainty, had no definition as to degree of confidence, and "may very well be more prejudicial than probative in value," so it sustained "the objection to strike Exhibit 40." Although Pruitt's trial counsel had no independent recollection of the event at the 60-1507 evidentiary hearing, he agreed that the record showed the court had stricken the exhibit but not its related testimony.

Yet the district court's order denying Pruitt's 60-1507 motion states: "The exhibit and testimony of [the analyst] was stricken from the record, and withdrawn from evidence, *i.e.*, the evidence was not provided to the jury during deliberations." But our review of the record causes us to agree with Pruitt that no testimony about Exhibit 40 was stricken from the record, although the court sustained defendant's objection to Exhibit 40 and withdrew it from the evidence submitted to the jury. The jury was never instructed to disregard the related testimony by the analyst or the detective, nor did the court give the jury a limiting instruction about it.

15

Jensen never asked the court to do so. Trial counsel admitted at the 60-1507 motions hearing that he had overlooked that. But based on his 47 years of experience doing criminal defense, he believed it was highly unlikely that the trial court would grant a motion for new trial on this basis. Still, because the district court made a factual error when analyzing deficient performance, substantial competent evidence is lacking. We thus assume that counsel's performance in this respect was inadequate and focus on whether Pruitt has met his burden to show prejudice—to show with reasonable probability that this deficient performance affected the outcome of the proceedings, based on the totality of the evidence.

Pruitt contends that the prejudice here is like that in *State v. Pruitt*, 42 Kan. App. 2d 166, 169, 211 P.3d 166 (2009). The *Pruitt* court held that, among other cumulative trial errors, an officer's testimony violated the district court's order in limine and prejudiced Pruitt. At trial, the prosecutor asked Officer Keiss if he were familiar with the suspect or defendant and Keiss replied: "'His name had c[o]me up on another incident . . . just prior to this,'" as a defense objection interrupted his sentence. 42 Kan. App. 2d at 170. But the *Pruitt* court reversed and remanded not only because the testimony improperly told the jury that Pruitt had been a suspect in another crime and the jury had not been told to disregard the testimony, but also because the prosecution committed other intentional errors, and the evidence against Pruitt was not overwhelming. 42 Kan. App. 2d at 173. It thus did not reverse based solely on the kind of error we assume here.

We find the more analogous case, on which both parties rely, is *State v. Moyer*, 306 Kan 342, 356, 410 P.3d 71 (2017). There, the Kansas Supreme Court considered whether a mistrial should have been granted after a jury viewed the unredacted version of a video that the trial court had ordered redacted to prevent the jury from viewing material prejudicial to the defense. 306 Kan. at 355-356. As for the first prong of the mistrial assessment, the Supreme Court found: "One would be hard-pressed to conjure up a more fundamental failure in the proceeding than having the State give the jury judicially

16

excluded evidence and the jury using that prohibited evidence as part of its deliberations." 306 Kan. at 356. The same type of failure happened here, as the court erred by giving the jury the detective's testimony about Exhibit 40 that should have been excluded since Exhibit 40 was excluded.

But despite that fundamental failure—the jury's improper viewing of the unredacted videotape—*Moyer* found the defendant was not entitled to a mistrial because the defendant failed to show prejudice. That is because the properly admitted trial evidence contained "inculpatory evidence of the same ilk" as was contained in the portions of the video that should have been redacted. 306 Kan. at 358. Because the properly admitted evidence created the same type of prejudicial negative inferences as did the inadmissible portions of the video, the prejudicial effect of the improperly admitted evidence was lessened. 306 at 357-358.

We follow that analysis here in our prejudice analysis, recognizing that *Moyer* was reviewing whether the district court abused its discretion by not declaring a mistrial and we are reviewing whether the defendant has met his burden to prove prejudice in an ineffective assistance of counsel analysis. The parties focus their arguments on whether properly admitted evidence here of the same ilk as improperly considered evidence created similar prejudicial negative inferences.

The State contends that the other strong evidence of Pruitt's location on the night of the shooting was repeatedly established by the testimony of Ballinger, Coe, Maynard, and Perry. Pruitt counters that such testimony is not "of the same ilk" as testimony related to Exhibit 40 because the latter was the only hard evidence or objective, scientific data showing where Pruitt was on the night of the murder. We decline Pruitt's invitation to make this distinction between kinds of testimony and focus on whether the properly admitted evidence created the same type of prejudicial negative inferences as did the testimony related to Exhibit 40.

17

Our review of the evidence shows that Pruitt fails to meet his burden to show prejudice. As the State argues, Pruitt's location on the night of the shooting was well established by properly admitted testimony. Maynard testified that Ballinger talked to her about Pruitt's killing of Little. Ballinger told Maynard he had driven Pruitt to Morgan's trailer, that Pruitt went to the house, that Pruitt took a gun with him, then Pruitt came back and told Ballinger: "'We need to get out of here.'"

Ballinger testified that he drove to the crime scene location with Pruitt. Ballinger had heard a telephone call between Coe and Pruitt about Little's whereabouts. When they arrived at Morgan's trailer, Ballinger tried to dissuade Pruitt from taking the gun out of the vehicle and threatening Little. Ballinger saw Pruitt remove the gun from the vehicle's console. He described it as a sawed-off .410 open break-over gun with a small shell attached to it by a rubber band.

Perry testified that Pruitt called him and told him he had shot Little and that Perry needed to pick up a gun. After Pruitt told Perry where the gun was, Perry drove to that location, picked the gun up, drove to Haverhill Bridge, and threw the gun in the Walnut River there. The gun was recovered, and it matched the description of the gun given by witnesses.

A forensic examination showed that the pellets in the round of ammunition found with the gun, the pellets in the .410 shotshell recovered from Pruitt's vehicle, and the pellets recovered from Little's body were consistent in weight, physical design, and construction. They were triple-aught buck size pellets, and were copper-plated, which not all buck shot pellets are.

And the Kansas Supreme Court omitted all mention of testimony about Exhibit 40 in its lengthy recitation of the "strong evidence" or "overwhelming evidence" showing that Pruitt had murdered Little. See *Pruitt*, 310 Kan. at 956-959.

18

"Laying aside for the moment the two brief segments of Ballinger's testimony that Pruitt uses to support factual appropriateness, the rest of the evidence in this case is overwhelming that whoever shot Little to death did so by firing a shotgun loaded with triple-aught buck from close range after lying in wait outside Morgan's trailer home for about 10 minutes. This makes this case very nearly a law school paradigm for premeditated murder by someone, and we have already referenced the strong evidence that the someone was the defendant." 310 Kan. at 970-71.

We agree with the State that any prejudicial effect of the testimony about Exhibit 40 was lessened by the amount of properly admitted inculpatory evidence of the same kind. Because that properly admitted evidence created the same type of prejudicial negative inferences as did testimony about Exhibit 40, the prejudicial effect of the improperly admitted evidence here is minimal. The strength of the properly admitted evidence about Pruitt's acts before, during, and after the shooting, including his location on the night of the shooting, and the shell in Pruitt's vehicle consistent with the one found on the gun retrieved by law enforcement and the pellets removed from Little's body, shows no reasonable probability that the jury would have reached a different verdict had it not heard any testimony about Exhibit 40. Thus, Pruitt has failed to establish prejudice.

C. *Was Pruitt's trial counsel ineffective for failing to object to testimony that Hise sold Pruitt a gun that matched the description of the gun used to murder Pruitt?*

Next, Pruitt argues that trial counsel was ineffective for not objecting to hearsay evidence that Hise had sold Pruitt a .410 shotgun, as was the murder weapon, thus inadvertently waiving his constitutional right to confrontation.

The district court held that Jensen had properly objected to the allegedly problematic testimony at trial and thus was not deficient. But the district court's order, which adopted the State's proposed findings of fact and conclusions of law, is again

19

incorrect. The record shows that this question by the State was not objected to: "Did not Mr. Billy Hise tell you he sold the gun to Mr. Pruitt?" And Murphy replied: "Yes, ma'am." A hearsay objection was made by Jensen, however, to a subsequent question. Jensen later testified that his failure to request to strike the hearsay testimony evidence was because of an "oversight"; he did not intentionally let the jury hear the responses as a matter of strategy.

For purposes of our review, we assume that counsel's performance was inadequate by not making a hearsay objection to the question whether Hise had told Murphy he had sold the gun to Pruitt. We thus determine only whether Pruitt has met his burden to show prejudice. The district court found that Pruitt failed to show a reasonable probability that but for the statement that "Mr. Hise sold the gun to Mr. Pruitt" Pruitt would not have been convicted, given other evidence that Pruitt had a gun on the night Little was murdered.

Pruitt acknowledges that Coe testified that he saw Pruitt with the gun and that Coe had heard Hise had sold the gun to Pruitt. But he contends this, and other statements by Coe, who had at first been accused of shooting Little, lack credibility, so Murphy's confirmation that Hise said he had sold that gun to Pruitt is prejudicial.

But the materiality of the question was not whether Hise had earlier sold a gun to Pruitt, but whether Pruitt had the murder weapon on the night of the murder. It mattered not whether Pruitt had bought the gun from Hise or from someone else or had otherwise acquired it. That Pruitt had the gun on the night of the murder was well established by testimony not only from Coe, and from Hise through Murphy, but by Maynard, Ballinger and Perry as well. Thus, even if trial counsel had made an effective hearsay objection to the question and had successfully moved to strike Murphy's testimony on that point and had gotten a limiting instruction on that matter, Pruitt fails to show prejudice.

20

And even assuming that we should apply the constitutional harmless error standard defined in *Chapman v. California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), (see *State v. Ward*, 292 Kan. 541, Syl. 6, 256 P.3d 801 [2011]), we find the State has proved beyond a reasonable doubt that this error did not affect the outcome of the trial in light of the entire record, *i.e.*, there is no reasonable possibility that the error contributed to the verdict.

*Do Cumulative Counsel Errors Deprive Pruitt of a Fair Trial?*

Finally, Pruitt argues that even if the alleged deficiencies would not warrant relief in isolation, combined, they prejudice him and require us to vacate his conviction.

When evaluating a claim of cumulative error, we look at the totality of the circumstances to determine whether the errors substantially prejudiced the defendant and denied him or her a fair trial. In making this determination, "an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). The cumulative error rule does not apply if there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

We have assumed two errors by trial counsel: Not moving for a mistrial to preclude the jury from considering testimony about Exhibit 40; and not making a hearsay objection to the question of whether Hise told Murphy he had sold the gun to Pruitt. This latter assumed error was a discrete error that did not compound the prior assumed error as to testimony about Exhibit 40. And considering the strength of other evidence against Pruitt, we find the totality of the circumstances did not prejudice Pruitt or deprive him of a fair trial.

21

Affirmed.